UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex rel</u>. [UNDER SEAL],<br><br>  Plaintiffs,<br><br>  v.<br><br>[UNDER SEAL],<br><br>  Defendant. | Case No.<br><br>COMPLAINT<br><br><br>**FILED IN CAMERA AND UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. §3730(b)(2)** |

**DOCUMENT TO BE KEPT UNDER SEAL**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, <u>ex</u> <u>rel</u>. ALICIA WILBUR<br><br>                                    Plaintiffs,<br><br>     vs.<br><br>MARTIN'S POINT HEALTH CARE INC.,<br><br>                                    Defendant. | Case No.<br><br>COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT<br><br><br>**FILED IN CAMERA AND UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. §3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Pursuant to the *qui tam* provisions of federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, (the "False Claims Act" or the "FCA"), *qui tam* Plaintiff-Relator Ms. Alicia Wilbur (hereinafter "Relator"), on behalf of the United States of America for this Complaint against Martin's Point Health Care Inc. ("Defendant"), alleges as follows:

## I.     INTRODUCTION AND OVERVIEW

1.     Defendant Martin's Point receives millions of United States taxpayer dollars it is not entitled to by fraudulently claiming that certain Maine and New Hampshire Medicare recipients are sicker than they really are.

2.     As one of Maine's health care providers and largest health insurers, Martin's Point provides or manages payment of health care to tens of thousands of Medicare beneficiaries. Medicare pays Martin's Point for this care through either the traditional fee-for-service model or through the managed care model, known as Medicare Advantage. Martin's Point's Medicare Advantage plan is known as "Generation Advantage." It is through this managed care plan that Martin's Point fraudulently reaps millions of dollars from Medicare, as described below.

3.     When Medicare beneficiaries enroll in a Medicare Advantage plan, at their option, the Plan manages all covered medical care to the member in exchange for a calculated

per member per month payment, which is determined by, and paid by, Medicare. In essence, Martin's Point acts as a health insurer, assuming risk, to whom Medicare pays a monthly premium.

4.      The flat monthly "premium" fee varies by member according to the health of each member, so that the fee paid to the Plan is commensurate to the risk of the cost of care the Plan will provide. The "sicker" the patient, the higher the fee. This adjustment of the fee based on health is known as "risk adjustment," and is reflected in a risk adjustment score assigned by CMS.

5.      The risk adjustment score is derived through "diagnosis codes" submitted to CMS by Martin's Point. These codes indicate health conditions of the beneficiary – e.g.  cancer, diabetes, or obesity. As Martin's Point reports more chronic, severe and numerous diagnoses codes, their risk adjustment score increases, as does the amount of their payments from Medicare. Accurate Medicare payments therefore directly depend on Martin's Point submitting accurate diagnosis codes.

6.      Martin's Point knows or should know that under regulatory requirements, contractual requirements, and its own express certifications to CMS, it has a duty to ensure that the diagnosis codes it submits to Medicare are accurate and supported by the members' medical charts. These duties include an obligation to delete diagnoses that Martin's Point knows or should know are invalid.

7.      Notwithstanding this duty, Martin's Point routinely submits diagnosis codes to CMS which it knows or should know are not accurate. Internal Martin's Point audits and other information revealed that it was submitting a significant number of inaccurate and unsupported diagnosis codes to CMS. In fact, an internal audit of diagnosis codes submitted for the years 2013, 2014, and 2015 revealed that many of the diagnoses were not supported by members' medical charts. Stunningly, in 2017, when Martin's Point retroactively reviewed a sample of these three years of medical charts, it found that the patients did not have (or the charts did not support) 60% of the illnesses reported to, and paid by, CMS.

8.      In response, Martin's Point did nothing: it did not investigate further, broaden its sample size nor look for these errors in prior time periods. On information and belief, it did not even notify CMS and kept the resulting overpayments.

9.      This audit and other sources routinely uncovered that many coding errors originate with healthcare providers, such as primary care physicians, who are not employed by Martin's Point but who are participating providers in the Generation Advantage plan. Under the plan, physicians provide diagnosis codes to Martin's Point, which are then generally submitted, unaltered, to CMS.

10.      Martin's Point is contractually responsible for the accuracy of physician provided diagnosis codes that it submits to CMS.

11.      Common provider coding errors included coding historical heart attacks, strokes and cancers, e.g. those that occurred and were treated in the past with no current treatment, as active conditions, e.g. as if the patients are in the throes of those serious medical events.

12.      Martin's Point knew that physician-supplied diagnosis codes were often inaccurate, and dedicated numerous resources to reviewing the charts and physician-supplied diagnosis codes in order to capture missing codes. Conversely, little to no resources were dedicated to correcting unsupported codes that resulted in overpayments. Instead, Martin's Point repeatedly pressured and directed employees and contractors to ignore unsupported codes – such as coding historical conditions as active – because deleting those codes would hurt profitability.

13.      Martin's Point developed a system to continually add diagnosis codes while ignoring unsupported or erroneous codes. Internally, Martin's Point divided these into "prospective" and "retrospective" review efforts. Prospective efforts impacted Medicare reimbursement for the current payment year. Retrospective efforts impacted adjustments from the previous payment year. Regardless of the internal label, both prospective and retrospective efforts involved a review of the charts after the fact and were strategies to allow Martin's Point

to add diagnosis codes for a beneficiary, above and beyond annual healthcare provider visits to increase revenue.

14.     To maximize Medicare payments in the prospective funding year, Martin's Point dedicated an entire internal unit and hired third party vendors to capture codes that physicians may have missed. Under the guise of promoting accuracy, charts were scoured, physicians were paid $100 to complete questionnaires and members were paid $25 to be re-examined. To maximize Medicare payments in the retrospective funding year, Martin's Point hired coders and contractors to review medical charts to capture additional diagnosis codes.

15.     The aim of these activities was purely revenue maximization, not accuracy. Martin's Point calculated that its return on investment in performing retrospective chart reviews was 8:1, and 3:1 for prospective reviews. In other words, for every dollar spent on these activities, $8 or $3 of increased Medicare payments would result.

16.     Martin's Point exerted pressure on its employees to add codes while ignoring erroneous codes by setting specific annual revenue-related goals. For example, it set specific ex-ante targets for overall risk scores, regardless of member health: for payment year 2017 its target score was .92. The target was insidiously set high enough to increase risk scores, but not high enough to trigger a CMS audit. Significantly, it also had a specific goal of obtaining additional revenue from its retrospective chart reviews ($26 million in retrospective accrual for payment year 2017).

17.     To ensure these goals were met, Martin's Point routinely directed employees and contractors to ignore erroneous codes.  In addition, it failed to return known overpayments.   For example, one of Martin's Point's third party vendors was so blatant in adding incorrect codes that Martin's Point terminated the vendor; however, on information and belief, Martin's Point failed to return the ill-gotten funds to the government. When chart reviewers in the retrospective chart review program considered a system to both add codes and delete known errors, they were told by management that such an effort would be a "waste" which diverted resources from their revenue goal.

18.     Relator, Alicia Wilbur, has direct, personal knowledge of the information alleged in this Complaint as she was the Manager of Medicare Risk Adjustment Operations at Martin's Point from mid-2016 through late 2017.

19.     Through its conduct, Martin's Point has violated the False Claims Act by knowingly submitting false claims for payment from the Medicare Advantage Program and making false statements or records material to claims for payment. These include adding inaccurate codes, and submitting false attestations regarding data accuracy. Martin's Point continued to submit data accuracy attestations even when it was on notice of an alarmingly high error rate from an audit of its submitted diagnosis codes. Had the Government known such attestations were false, the Government would have ceased or decreased its payments to Martin's Point.

20.     Martin's Point has also violated the False Claims Act by failing to perform deletes of inaccurate codes, and by retaining overpayments and thereby knowingly and improperly avoiding or decreasing an obligation to pay the Government. On information and belief, overpayments resulting from the erroneous coding of three conditions alone – cancer, strokes, and heart attacks – as active instead of historical have resulted in millions per year of Medicare overpayments to Martin's Point.

## II.    PARTIES

21.     Relator, Ms. Alicia Wilbur, served as Martin Point's Manager of Medicare Risk Adjustment Operations from April 2016 to October 2017. In this position, Ms. Wilbur reported directly to Manuel Gaidola, the Martin's Point Director of Medicare Revenue Operations. Ms. Wilbur had previously served as a Billing Supervisor in Patient Accounts at Martin's Point, beginning in December 2013. Ms. Wilbur holds a B.A. in International Relations and Asian Studies from Lake Forest College, in Lake Forest, Illinois, as well as an M.B.A. in Global Business from Southern New Hampshire University. Ms. Wilbur has been a Certified

Professional Coder since December 2016, and a Certified Risk Adjustment Coder since December 2017.

22.     Relator became aware of the fraud through her position as Manager of Medicare Risk Adjustment Operations for Martin's Point. In this position, Relator was directly responsible for enacting operational directives from her supervisor, Manuel Gaidola. Relator's responsibilities included overseeing the Martin's Point retroactive chart review program for Medicare Advantage plans. Through this work, Relator became aware that Martin's Point engaged in only a "one-way look" in retroactive chart review, a.k.a. reviewing beneficiary charts to add diagnosis codes and increase payments from Medicare, while having no system for reviewing or deleting inaccurate codes that would result in overpayment from Medicare. Relator also became aware that chart reviewers and coders for Martin's Point frequently noticed errors resulting in overpayments from Medicare, yet had no way of deleting or correcting these codes. Relator also became aware that by at least 2016, audits of Martin's Point codes submitted to Medicare, shared with Martin's Point management, demonstrated similar significant error rates. From mid-2017 through her departure, Relator raised numerous objections to Martin's Points' Medicare risk adjustment practices.

23.     Defendant Martin's Point Health Care is a health care organization headquartered at 331 Veranda Street (Building 6), Portland, ME 04103. Through the Martin's Point Generations Advantage program, Defendant offers Medicare Advantage ("MA") plans, funded under Medicare Parts C & D, for beneficiaries in Maine and New Hampshire. These plans covered ~40,000 MA beneficiaries in 2017: on information and belief, the plans are on track to collect ~$380M in risk adjusted Medicare payments this year. Defendant's risk adjusted payments are calculated based on risk adjusted codes submitted by the Defendant to CMS. As a condition of receiving these Medicare Part C & D funds, Defendant makes a number of annual certifications as to the integrity and accuracy of the data it submits to CMS.

III.     **JURISDICTION AND VENUE**

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.

25.     Although the issue is no longer jurisdictional, the public disclosure provisions of the federal False Claims Act do not bar this suit.  To the extent there has been a public disclosure of the allegations or transactions alleged in this complaint, Relator is an original source of the information on which this complaint is based.  She reported the information to the Government before any public disclosure of the allegations or transactions, has information that is independent of the public disclosure and that information materially adds to any information that the Government may have.

26.     This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendant has minimum contacts with the United States.  Moreover, the Defendant can be found to have transacted business in the District of Maine.

27.     Venue is proper in the District of Maine pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the Defendant can be found in and/or transacts or has transacted business in this district.  At all times relevant to this Complaint, Defendant regularly conducted substantial business within this district and maintained employees and offices in this district.

IV.     **APPLICABLE LAW**

A.     **The False Claims Act**

28.     The FCA was originally enacted during the Civil War.  Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United

States to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

29.     The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval and knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(A)-(B).  Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

30.     For purposes of the FCA, a person "knows" a claim or statement is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  The FCA does not require proof that a defendant specifically intended to commit fraud.  *Id.*

31.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery.  Such an action is known as a *qui tam* action and the individual bringing the suit is a *qui tam* relator.  The FCA requires that the *qui tam* complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

**B.**      **Medicare Part C: Medicare Advantage and Risk Adjusted Payments**

32.      Medicare is a federally-operated health insurance program administered by CMS. Medicare benefits individuals age 65 and older and the disabled.  42 U.S.C. § 1395c, et seq. Parts A and B of the Medicare Program are known as "traditional" Medicare.  Medicare Part A covers inpatient and institutional care.  Medicare Part B covers physician, hospital outpatient, and ancillary services and durable medical equipment.

33.      Under Medicare Part C, Medicare beneficiaries can opt out of the traditional Medicare Program (Parts A and B) and instead enroll in Medicare Advantage Plans ("MA Plans") and receive health care services managed by those MA Plans.  MA Plans must provide Medicare beneficiaries all the services that they are entitled to receive from the traditional Medicare Program. Organizations providing MA Plans – such as Defendant Martin's Point – are Medicare Advantage Organizations ("MA Organizations").

34.      Under Part C, Medicare pays each MA Organization a predetermined base monthly amount for each Medicare beneficiary in its MA Plans.  This monthly payment is known as a "per-member, per-month" payment.

35.      Payments to MA Organizations are risk adjusted for each beneficiary based on various health risk factors. See 42 U.S.C. § 1395w-23(a)(1)(C). Since 2004, CMS has employed the Hierarchical Conditions Category ("HCC") model, which takes into account both demographic factors (such as age and gender) and health status to determine the risk scores for beneficiaries in MA Plans. With respect to health status, the model takes into account diagnoses from physician office visits and hospital outpatient encounters as well as hospital inpatient stays.

36.       The medical conditions included in the model are grouped into HCCs, which are categories of clinically-related medical diagnoses.  See 42 C.F.R. § 422.2.  The Government assigns a relative numerical value (also known as a relative factor, multiplier, or coefficient) to HCC diagnosis codes that correlate to the predicted incremental costs of care associated with treating the medical conditions in each category. Higher relative values are assigned to HCCs

that include diagnoses with greater disease severity and greater costs associated with their treatment.

37.     By risk adjusting for health status, Medicare pays MA Organizations more for beneficiaries with certain serious chronic medical conditions and, thus, higher risk scores than for beneficiaries who do not have those conditions and, thus, have lower risk scores. Payments from Medicare therefore increase if an MA Organization reports more, or more severe, medical conditions.

38.     For risk adjustment payment purposes, medical conditions must be documented by a qualified healthcare provider (e.g., a doctor) in the beneficiary's medical record during the previous year.

39.     Significantly, for risk adjustment payment purposes, the diagnosis codes that the healthcare provider, his or her administrative or billing support staff, or anyone else (such as the MA Organization) assigns to a beneficiary must be supported by the beneficiary's medical record. Medicare Managed Care Manual, Chapter 7, § 40 (September 19, 2014) ("All diagnosis codes submitted must be documented in the medical record and must be documented as a result of a face-to-face visit.")

**C.     Defendant's Data Integrity Obligations**

40.     MA Organizations, such as Defendant Martin's Point, are obligated to ensure the diagnosis codes they submit to CMS – the sole basis of their risk adjusted payment based on a beneficiary's health status[1] – are supported and validated by the medical records of the beneficiaries in their plans. This fundamental obligation is incorporated into MA Organization's contracts with the Government.

---

[1] In a few instances, Medicare Advantage payments may be determined by factors other than diagnosis codes: (1) beneficiaries whose payments are based on a "new enrollee" status (per member per month) for the first 12 months they are Medicare eligible and (2) dual Medicare/ Medicaid enrollees. Other socioeconomic and demographic factors may also impact reimbursement.

1.     Defendant's Regulatory Data Integrity Obligations

41.     MA Organizations, such as Defendant Martin's Point, must annually attest that the diagnosis codes they submit for risk adjustment payments are accurate and truthful based on best knowledge, information, and belief.  42 C.F.R. § 422.504(l)(2). Attestations are submitted after the final deadline for submission of risk adjustment data but before the receipt of the MA Organization's final reconciliation payments for a given payment year.  This annual attestation declares that:

> "[a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on the form[] attached hereto as . . . Attachment B (risk adjustment data) **which attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) the accuracy, completeness and truthfulness of the data identified on these attachments.**
>
> […]
>
> 2. Attachment B requires the CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to such officer, must attest to (based on best knowledge, information and belief, as of the date specified on the attestation form) that **the risk adjustment data it submits to CMS under 42 CFR § 422.310 are accurate, complete, and truthful.**  The MA Organization shall make annual attestations to this effect for risk adjustment data on Attachment B and according to a schedule to be published by CMS.   If such risk adjustment data are generated by a related entity, contractor, or subcontractor, then such related entity, contractor, or subcontractor must also attest to (based on best knowledge, information, and belief, as of the date specified on the attestation form) the accuracy, completeness, and truthfulness of the data. [422.504(l)] (emphasis added)

42.     Defendant must "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct non-compliance with [the Government's] program requirements as well as measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi). Minimum core requirements of such a program include a system for "internal monitoring and audits and, as appropriate, external audits, to evaluate […] compliance with CMS requirements […]," "investigating potential compliance problems as

identified in the course of self-evaluations and audits, correcting such problems promptly and thoroughly[…]," conducting "timely, reasonable inquiry into" discovered misconduct, and conducting "appropriate corrective actions (for example, repayment of overpayments, disciplinary actions against responsible employees)" in response to potential violations. Id.

        2.    Defendant's Contractual Agreements to Data Integrity

43.    As a condition of participating in the MA Program, MA Organizations such as Defendant are required to agree in writing to comply with the Part C and D regulations and any other terms and conditions CMS deemed appropriate.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  Each year during the relevant time period, one or more executives of Defendant executed these written agreements or renewals of these written agreements between the Defendant and CMS.

44.    The regulations specifying the terms and conditions of the contractual relationship between MA Organizations and CMS have remained the same for many years.  Accordingly, from year to year, the terms and conditions of these written agreements between the Defendant and CMS remained very similar, if not identical.

45.    For each contract between CMS and MA Organizations, "the MA contract is deemed to incorporate any changes that are required by statute to be implemented during the term of the contract, and any regulations or policies implementing or interpreting such statutory provisions." Medicare Managed Care Manual, Chapter 11 § 20 (April 2007). Such laws include the False Claims Act. Id. at§ 20.3. The material terms of the contract also must include that the MA Organization agrees to "comply with all reporting requirements including the submission of data" Id. at §100.1.

46.    Furthermore, "as a condition for receiving a MA related monthly payment from CMS, the [MA Organization] agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to such officer, must request payment under the contract on a document that

**attests to (based on best knowledge, information and belief, as of the date specified on the certification form) the accuracy, completeness, and truthfulness of relevant data that CMS requests**." Id. at §130 (emphasis added.) The MA Organization must ensure that related entities, contractors, and subcontractors that generated risk adjustment data also attest to the accuracy and truthfulness of the data as well. Id.

47.     CMS may terminate the contract upon discovering fraud or the "MA organization fails to provide CMS with valid risk adjustment data, Id. at §80.1; see also 42 C.F.R. § 422.510. In addition, since at least 2003, MA Organizations and entities that submit risk adjustment data on their behalf have been required to execute Electronic Data Interchange ("EDI") agreements prior to submitting risk adjustment data.  These EDI agreements are considered contracts by which the MA Organizations attest to the accuracy of the data submitted.  Even if another entity submits the data, the MA Organizations are still responsible for the content of the submissions. See Risk Adjustment 101 Participant Guide § 2.1 (2013).

48.     By executing these EDI forms, the MA Organizations agree that (i) they will be responsible for all risk adjustment data submitted to CMS by themselves, their employees, and their agents; (ii) they will submit risk adjustment data that is accurate, complete, and truthful based on best knowledge, information, and belief; (iii) they will research and correct risk adjustment data discrepancies; and (iv) CMS has the right to audit and confirm the risk adjustment data, including diagnoses, submitted by the MA Organization and the right of access to the beneficiaries' medical records to conduct such audits. An MA Organization's attestations to data integrity are false when they have created review systems that only add codes, while ignoring errors – especially if they are on notice of significant error rates.

### 3.     Defendant's Obligation to Delete Invalid Diagnoses

49.     MA Organizations are obligated to delete invalid diagnoses, or to use other available means to return risk adjustment payments based on invalid diagnoses. This obligation stems from their ongoing regulatory data integrity obligations, and their contractual obligations

that incorporate these requirements.  Failure to delete invalid diagnosis results in the retention of an overpayment from Medicare.

50.     As noted above, MA Organizations are required by contract to follow applicable CMS regulations and guidance. CMS has made it abundantly clear that MA Organizations are required to delete erroneous diagnosis data. The Medicare Managed Care Manual, for example, requires that"[i]f upon conducting an internal review of submitted diagnosis codes, the [MA Organization] determines that any ICD-9-CM diagnosis codes that have been submitted do not meet risk adjustment submission requirements [which includes medical record support for all diagnoses], the [MA Organization] is responsible for deleting the submitted ICD-9-CM diagnosis codes as soon as possible."  Medicare Managed Care Manual, Chapter 7, § 40 (June 2013).

51.     A mandatory requirement and instructions about deletion of invalid diagnoses were also set forth in other CMS instructional materials used to train MA Organizations. For example, instructions in CMS' presentation slides for a July 1, 2014 Risk Adjustment Webinar used to provide training to MA Organizations and others about how risk adjustment operates noted that "<u>all information that is submitted must be correct.  If a plan identifies incorrect or invalid information that has been submitted, it must delete that information</u>."

52.     Martin's Point, like other MA Organizations, submits risk adjustment data, including diagnoses, to CMS using CMS' Risk Adjustment Processing System ("RAPS"). RAPS has a field that is called a "Delete Indicator" and would allow Martin's Point to comply with their obligation to delete invalid diagnoses that they previously submitted in order to withdraw or retract the invalid diagnoses.

53.     Invalid diagnoses can be deleted both before and after the final deadline for RAPS data submissions.  The final deadline is only a submission deadline; it does not pertain to deleting invalid diagnoses in order to withdraw them.  See 42 C.F.R. § 422.310(g)(2)(ii). Diagnoses deleted before the deadline for RAPS data submissions for a payment year are known as "open-period deletes" and diagnoses deleted after the deadline for RAPS data submissions for a payment year are known as "closed-period deletes."

54.     If, prior to the final submission deadline, an MA Organization is in possession of or has access to information about invalid diagnoses, it should delete invalid diagnoses prior to that deadline to ensure that the final reconciliation payment that it is claiming is correct.

55.     If an MA Organization comes into possession or otherwise gains access to information about invalid diagnoses after the final submission deadline, it must still delete the invalid diagnoses, and CMS will still recover the risk adjustment payments associated with the deleted diagnoses as part of additional risk score rerun and reconciliation processes it has in place to recover overpayments.

56.     All of the above-mentioned Participant Guides and other instructional materials also describe an alternative method for deleting erroneous data using a Direct Data Entry system. All of the above-mentioned Participant Guides and other instructional materials have been and continue to be available to all MA Organizations and others on a website hosted by a CMS contractor.  See www.csscoperations.com.

57.     The obligation to delete invalid diagnoses also is imposed on MA Organizations by the data integrity requirements of contracts and regulations requiring MA Organizations to implement effective compliance programs, and regulations and contractual terms requiring submission of Risk Adjustment Attestations certifying risk adjustment data is accurate and truthful.

58.     The diagnoses codes submitted to CMS are themselves claims for risk adjustment payments, and are a major determinant of the MA Organization's payment. The accuracy of submitted diagnosis codes is thus material to any payments from the Government to the MA Organization.

59.     A false Risk Adjustment Attestation is also material to payment, as it relates directly to the data element – diagnoses – that is the sole determinant of risk adjustment payments based on health status.

60.     Submission of invalid diagnoses, failing to delete invalid diagnosis, and/or submitting false Risk Adjustment Attestations are not minor or insubstantial infractions of Defendant's obligations to Medicare with which they pledge to comply. Had CMS become aware that such attestations were false, and inaccurate diagnosis codes were submitted, it would have ceased or reduced payments to Defendant. Indeed, the Government has ceased payment and brought False Claims Act actions against MA Organizations for such conduct.

## V.     BACKGROUND

61.     Martin's Point employs a system that allows continual review of a patient's health profile or chart, exclusively with the aim of revenue maximization. This system creates multiple opportunities to add new diagnosis codes for a beneficiary. It also creates multiple instances where erroneous codes already submitted for a beneficiary are detected yet purposefully ignored.

62.     Internally, Martin's Point divides these into "prospective" and "retrospective" efforts. Prospective efforts impact Medicare reimbursement for the current payment year. Retrospective efforts impact adjustments from the previous payment year. Regardless of the internal label, both prospective and retrospective efforts involved a review of the charts after the fact, and were strategies to allow Martin's Point to add diagnosis codes for a beneficiary, above and beyond annual healthcare provider visits.

### 1.     "Prospective" Generation of Diagnosis Codes

63.     Diagnosis codes generated "prospectively" are added during the year prior to the actual payment year. Martin's Point used at least three methods to add diagnosis codes at this phase: (1) through face-to-face beneficiary visits with health care providers, (2) similar encounters with Martin's Point contractors, or (3) through post-visit coding of a "Comprehensive Visit Form" generated by primary care providers.

64.     During the payment year, diagnosis codes are first directly generated by health care providers. These health care providers may be beneficiaries' primary care providers ("PCPs") or medical specialists. Although Martin's Point itself employs PCPs, the vast majority

of its plan beneficiaries see PCPs from other institutions. Codes generated through these encounters with health care providers will be referred to in this Complaint as "provider-reported diagnoses." Shortly after the face-to-face encounter, provider reported diagnosis codes are then transmitted through claims data to Martin's Point.

65.     Martin's Point also hires contractors that perform work similar to PCPs, generating diagnosis codes and medical charts for beneficiaries during visits with the contractor's nurse practitioners or doctors.

66.     As detailed below, Martin's Point understands that their providers and contractors make frequent coding errors that result in overpayment. Common errors include coding historical heart attacks, strokes and cancers, e.g. those that occurred and were treated in the past with no current treatment, as active conditions, e.g. as if the patients are in the throes of those serious medical events.

67.     Martin's Point also adds codes by sending beneficiaries' primary care providers ("PCPs") a Comprehensive Visit Form each year, detailing the beneficiary's diagnosis codes / conditions for the previous year and asking the PCP to validate the condition or add new codes. Martin's Point collects these forms, and spends significant resources coding these PCP forms itself.

68.     During the coding of the Comprehensive Visit Form, a Martin's Point coder can see all other diagnosis codes for a beneficiary – including erroneous or unsupported codes a provider may have submitted. As detailed below, however, coders are directed to only add codes, and ignore such errors.

### 2.     Submitting Diagnosis Codes to CMS During Payment Year

69.     Martin's Point, like other MA Organizations, submits risk adjustment data, including diagnoses, to CMS using CMS' Risk Adjustment Processing System ("RAPS").

70.     As noted above, during the payment year, risk adjustable diagnosis codes can be generated by provider encounters, encounters with a Martin's Point contractor, or a Martin's Point coder based on Comprehensive Visit Form information.

71.     Martin's Point submits provider reported diagnosis codes to CMS on a monthly basis. On information and belief, the vast majority of provider reported diagnosis codes are not subject to quality assurance or data validation before being sent to CMS.

72.     Each RAPS submission must include the following information:  the Medicare beneficiary's identification number (called a "HIC number" or "HICN"); the date(s) of the medical encounter (the physician office visit, hospital outpatient visit, or hospital inpatient stay); the type of provider (physician or hospital); and the diagnosis code(s) reported by the provider for the encounter.  Each RAPS submission is a claim for payment.  If the data submitted is invalid, the claim is false.

### 3.     "Retrospective" Addition of Diagnosis Codes

73.     Since 2013, Martin's Point has also generated diagnosis codes that retrospectively impact payment adjustments from the previous payment year. Martin's Point does so through its retrospective Chart Review Program.

74.     Using advanced algorithms to identify potential patient records that could be fruitful for revenue maximization, the Chart Review Program works by collecting patient medical records (also known as "charts") from providers and then employing diagnosis coders (also known as "chart reviewers") to review the medical records. The reviewers mine charts for **new** diagnoses that healthcare providers themselves did not report to Martin's Point.

75.     Martin's Point's algorithm pulls charts for the Chart Review Program based on criteria that they believe creates a likelihood of finding "add" codes.  For example, it detects if conditions coded in earlier years did not appear this year (e.g. breast cancer indicated last year but not this year), or if diseases that commonly co-exist did not both appear on the medical

record (e.g. obesity diagnosed but common co-morbidity hypertension is not).  Some chart reviewers are Martin's Point employees and some are contractors.

76.    Diagnosis codes reviewed during the retrospective Chart Review Program have already been submitted to Medicare.

77.    Chart reviewers were able to view all the codes submitted as well as the patient charts and could therefore detect not only whether a code should be added, but also whether a code had erroneously been submitted and should be deleted. During all years in question in this Complaint, a reviewer could access claims data through the Martin's Point claims processing system (QNXT). From 2017 onward, chart reviewers' technological interface for reviewing charts displayed diagnosis codes submitted to CMS – including potentially erroneous codes – side-by-side the underlying patient record.  Since the inception of the Chart Review Program, chart reviewers could therefore detect whether a submitted code was not supported by, or contradicted by, the patient's record.

78.    As detailed below, however, Defendant made clear to chart reviewers that they were only to add new diagnosis codes, and ignore any erroneously submitted codes.

## VI.    **ALLEGATIONS**
### A.    **Defendant created a system designed to incentivize and pressure employees and contractors to add codes but not delete erroneous codes.**

79.    Defendant Martin's Point Health Care offers Medicare Advantage plans through its Generation Advantage program. On information and belief, Defendant receives hundreds of millions of Medicare dollars each year for these plans.

80.    Defendant knew that it was required to ensure that diagnoses submitted to Medicare for risk adjustment payments were supported and validated by the medical records of the beneficiaries.  Nevertheless, Defendant falsely attested that it complied with these requirements, while knowingly failing to delete erroneous codes and retaining known overpayments.  It did this by incentivizing healthcare providers to add information to previously

submitted claims, by pressuring employees to ignore erroneous codes, and by incentivizing contractors to ignore erroneous codes.

81.     Martin's Point developed a system to continually add diagnosis codes while ignoring unsupported codes in order to maximize revenue. This revenue maximization pipeline begins with a multi-pronged effort – including incentives to providers/patients – to ensure patient records are continually revisited to add diagnosis codes in the prospective payment year. It continues with a retrospective Chart Review System, which uses coders to scour beneficiary medical records to capture adjustments from the past payment year.

82.     Martin's Point calculated its return on investment in performing retrospective chart reviews: for every dollar spent on these activities, $8 of increased Medicare payments would result. For prospective reviews, every dollar spent generated $3 of increased Medicare payments.

83.     Through this system, Martin's Point has wrongfully received and retained millions of dollars of Medicare funds.

        1.     <u>Incentives to Healthcare Providers</u>

84.     Martin's Point incentivizes healthcare providers to capture as many risk adjustable codes as possible. For example, Defendant used its own funds to reimburse providers and PCPs for both "wellness visits" and annual physicals: Medicare only reimburses annual wellness visits, never for physicals. By doing so, Defendant effectively either (1) paid healthcare providers to revisit a patient chart through a redundant visit, or (2) paid them double the usual Medicare reimbursement by paying for both visits at once. Defendant also provided $25 gift cards to patients for participating in these visits, and also paid for home visits for these exams, even if Medicare did not reimburse the home visit.

85.     Defendant's Revenue Department – not Clinical Department – also distributed "Comprehensive Visit Forms" for each MA beneficiary to its PCPs. This Comprehensive Visit Form listed a beneficiary's recent conditions and diagnosis codes, then asked the PCP to validate

the condition by circling either "Yes" or "No." The PCP then attached the patients' medical records to the form, and returned it to Defendant. PCPs were paid $100 per form by Defendant, regardless of the form's content.

86.    Martin's Point knows that significant and pervasive errors existed in these provider-generated codes: specifically, a number of conditions were coded as active instead of historical. **Most commonly, these were heart attacks, strokes, and cancers.** Chart reviewers later revisiting the records to add codes, however, were encouraged to ignore these issues.

2.    Coding Comprehensive Visit Forms and Ignoring Errors

87.    Defendant dedicated significant resources to ensuring all diagnosis codes reported on the Comprehensive Visit Form were entered into the beneficiary's risk adjustment score. In fact, to meet 2017 revenue goals, Relator witnessed the few staff members working on a nascent quality assurance program reassigned.

88.    During the coding of the Comprehensive Visit Form, a Martin's Point coder could see all other diagnosis codes for a beneficiary – including erroneous or unsupported codes a provider may have submitted.

89.    Relator discovered through conversations with co-workers that coders indeed noticed errors in provider submitted codes during this process. Yet, rather than begin to review diagnosis codes for potential errors and deletions, these staff members were asked to only add diagnosis codes that generated revenue.

3.    Revenue Maximization Pressures through Target Setting

90.    Martin's Point exerts pressure on coders to add codes while ignoring errors by setting specific annual revenue related goals. For example, it set specific ex-ante targets for overall risk scores, regardless of member health: for payment year 2017 its target score was .92. The target – set by Martin's Point's financial department, rather than any clinical personnel – was set high enough to increase risk scores, but not high enough to trigger a CMS audit.

91.     For years, Martin's Point also has maintained a hard revenue "recapture" target for the Chart Review Program. In 2017, Defendant's explicit goal was for the Chart Review Program to "recapture" at least $26M from Medicare.

92.     Defendant's Senior Managers, including Manuel Gaidola (Director Medicare Revenue Operations) emphasized this goal at nearly every employee meeting. Chart reviewer bonuses and job prospects were predicated on the achievement of this goal. Mr. Gaidola and others made it clear to chart reviewers that "jobs would be lost" if the yearly revenue goal was not met.  Concerns that the Chart Review Program needed to include deletion of erroneous codes to comply with Medicare obligations were rejected on the grounds that the revenue goal could not be met with such processes in place.

4.     <u>Contractor Incentives & Burying Contractor Errors</u>

93.     Defendant also hired several contractors to perform additional face-to-face visits with beneficiaries with the aim of capturing the full diagnostic profile of the patient.

94.     As detailed below, at least one of these contractors – Semler Scientific – was discovered to have systemic issues with upcoding and lack of documentation. Yet Martin's Point made no effort to correct their previously submitted codes.

95.     Defendant also hired contractors to perform retrospective chart reviews. Like Martin's Point's own chart reviewers, Martin's Point incentivized these contractors to ignore errors and only add new diagnosis codes.  The contractors Martin's Point hired to review charts and add codes as part of the Chart Review Program did not have a system to delete erroneous codes they discovered, nor were they directed by Martin's Point to report such errors.

96.     At least one chart review contractor – DxID – was paid on a purely contingency basis, collecting a percentage of any additional revenue generated from Medicare.

**B.      Through implementation of this system, Martin's Point maintained a "one-way look" Chart Review Program that sought only to maximize Medicare risk adjustment revenue while ignoring erroneous codes.**

1.      Coders Only Add Diagnoses Codes

97.      Since its inception, Martin's Point's Chart Review Program has been a one-sided revenue-generating program. Defendant did not review the charts in good faith in order to obtain a true and accurate picture of the health status of the member, or to submit truthful and accurate risk adjustment data to the Government. Chart reviewers were directed to collect codes – aka perform "adds" – that would increase payments, while systemically ignoring results of chart reviews that would have led to decreased payments.

98.      Chart reviewers were not expected to identify and correct an incorrect code or diagnosis found on records, a.k.a. make "deletes," though they knew, or recklessly disregarded, or were deliberately ignorant that such incorrect codes had already been submitted to CMS via the RAPs system.

99.      Chart reviewers were evaluated for their chart review volume and accuracy of codes they themselves added: however, they were never evaluated for (and never penalized for) failing to catch provider-coding errors.

2.      Martin's Point Has No "Deletes" System for Discovered Errors

100.      There was in fact no system at all for "deletes" if chart reviewers found an error, and Defendant has **never** had a system for deleting provider-coding errors in their Chart Review System.

101.      Discussions of needing institutionalized 'deletes' – or a two way look system – began in 2016, largely due to Relator's objections to the existing system. By March 2017, notes circulated internally – including to Martin's Point senior management – began to indicate awareness that Defendant "need[s] system for deletes."

102.      In the interim, Relator – as Manager of Medicare Risk Adjustment Operations– attempted to go above and beyond her job duties to institute a manual system for deletes, despite lack of support from Martin's Point management. Relator asked chart reviewers to email one

designated associate when an error was found in charts. From March-April 2017, a list of "deletes" – a few dozen codes identified as wrong or unsupported -- was generated through Relator's efforts.

103.     Despite Martin's Point's actual knowledge that these codes were erroneous, to Relator's knowledge, many of these deletes were never made.

104.     In May/June 2017, Relator's team panicked that that they would not hit targets if they continued to look for deletes. Relator, under pressure from her own supervisor that the team was not on track to hit financial targets, felt she could not continue asking Chart Reviewers to manually submit deletes without risking their jobs.

105.     Relator and others were repeatedly told by Mr. Gaidola that any efforts which jeopardized Defendant's ability to meet its $26M revenue recovery goal were essentially a waste of time. This line of reasoning was explicitly used to reject or delay the creation of a "deletes" system, or create a compliant "two-way" look Chart Review System.

106.     When an "audit" function was added to Defendant's Chart Review Program internal interface in fall 2017, chart reviewers were directed to "not click on it" because a separate audit team would perform the work. On information and belief, however, no audit and validation function had been created, nor were there concrete plans in place to do so.

107.     On information and belief, no regular audits, data validation systems or other coding quality assurance existed at Martin's Point.

108.     In fact, attempts to create a QA system were repeatedly quashed as it would have diverted resources away from revenue generating activity. In mid-2017, once it was discovered that Martin's Point was behind its $26M revenue goal, Defendant re-tasked individuals engaged in nascent QA efforts to add provider-reported codes from Comprehensive Visit Forms.

             3.     Defendant Ignored Warnings from Relator and Others

109.     Relator repeatedly expressed concern to Martin's Point management that Martin's Point's risk adjustment program exposed the organization to potential liability. At various points,

these conversations included Relator's direct supervisor, Manuel Gaidola, Dave Stearns (Senior Director of Health Plan), Tim Pulsoni (Manager, Clinical Risk Adjustment Operations), Rebekah Dube (VP of Health Plan), and Megan Foley (Team Lead, Risk Adjustment Coding Quality Analyst).

110.    Relator began to more fully understand the potential problems with Martin's Point "one way look" system of chart review after beginning preparation for a professional society conference in September 2017, at which she was co-presenting a three-hour workshop on risk adjustment coding compliance, which highlighted concerns about these same compliance issues.

111.    When later confronting supervisor Manuel Gaidola, Relator conveyed these concerns and pushed for a "two way look" system. Relator noted that she believed Martin's Point had a duty to seek and delete erroneous or unsupported diagnosis codes submitted to CMS, and failure to do so could expose Martin's Point to liability. Mr. Gaidola responded that Martin's Point's practices would not change, and that Relator should look for other work if she disagreed.

C.    **Since at least 2016, Defendant's internal audits have revealed high error rates in provider-reported diagnosis codes submitted to CMS, but Defendant has taken no action to correct past overpayments or ensure accuracy of future code submissions.**

112.    Since at least 2016, Defendant has been on notice that a significant percentage of diagnoses codes reported by providers to them ("provider-reported diagnoses") are invalid because the beneficiaries' medical records do not substantiate that the beneficiaries had the medical conditions identified by the diagnosis codes reported by the providers.

113.    **Specifically, since at least 2016/2017, Defendant has known that three conditions – heart attack, strokes, cancer – were frequently erroneously coded as active when they were historical conditions, resulting in inflated risk scores and overpayments from CMS.**

114.    Defendant knew about this issue from internal audits, and from its own internal medical record reviews.

1.    2016 SEMLER Audit

115.    In 2016, Defendant conducted an internal audit focused on SEMLER – a contractor providing only "prospective" services, to ensure their chart review captured as many diagnoses as possible.

116.    This audit found 138 errors, and all but 3 resulted in overpayments by CMS. 123/138 diagnoses had insufficient documentation, and 12 diagnoses didn't exist based on the chart. The overall error rate is unknown, as the overall number of codes audited was unknown by Relator.

117.    A 2017 "mini-audit" of SEMLER performed by Megan Foley (Team Lead, Risk Adjustment Coding Quality Analyst) and Tonia Arnold (Clinical Documentation Improvement Nurse) revealed similar issues. To Relator's knowledge, no deletes for errors discovered in this audit were submitted to CMS.

118.    Despite awareness of significant quality control issues with SEMLER, Defendant continued to use the contractor through August 2016.

2.    2017 Retrospective Chart Review Program Audit.

119.    Another small-scale 2017 internal audit revealed almost a 60% error rate in diagnosis codes submitted to CMS.

120.    Martin's Point undertook this audit to understand why it was behind in hitting its $26M goal for retrospective Chart Review Program revenue recapture. Relator reiterated in discussions about the issue that she observed where providers were inaccurately coding certain conditions. These included coding historical conditions such cancer as active. As noted above, one manner in which medical records were chosen for the Chart Review Program was if a condition was coded in one year, but not the following year – e.g., if breast cancer was diagnosed in 2016 but not 2017. When a diagnosis was wrong in the first place – e.g., if the 2016 breast cancer diagnosis had been wrong – a chart reviewer would rarely find another code to "add."

121.    Martin's Point management performed the audit in response to Relator's assertion that provider coding errors were pervasive in their claims to CMS.

122.    For this audit, Defendant reviewed 48 codes that already had been submitted to CMS. The codes were selected on the basis of seeking "drops" – conditions Defendant had been paid for by CMS on a certain beneficiary, but no longer were. These codes were for the 2016 retroactive chart review year, meaning that CMS had already paid Defendant for the conditions in 2015, 2014, or 2013.

123.    Notably, it was Martin's Point management that decided the sample size (48), concluding that this size was sufficient to answer the question as to the existence of provider coding errors.

124.    The audit's conclusion was 28/48 diagnosis codes were incorrect and should never have been submitted to CMS. Though the error rate could not be directly extrapolated to Defendant's entire beneficiary pool, Martin's Point staff considered it alarmingly high.

125.    Consistent with Relator's expressed theory, the source of these errors was primarily provider reported codes. It also included, however, erroneous "adds" by Martin's Point chart reviewers during the retrospective Chart Review Process, as well as errors by contractors.

126.    Relator attended a September 2017 Retrospective "Hackathon" Meeting where these findings were presented to multiple Martin's Point executives. The purpose of this meeting was to discuss issues regarding the retrospective Chart Review Program, and discuss strategies for revenue maximization. Participants included Rebekah Dube (VP of Health Plan), Dave Stearns (Senior Director of Health Plan), Manuel Gaidola (Director Medicare Revenue Operations) and other senior level management. Meeting notes specifically reflected that an issue of concern was cancers coded as active, when they were historical. Relator recollects that all three error prone codes of heart attack, stroke and cancer were mentioned in this meeting.

127.    No executives present at the meeting mentioned Martin's Point's obligation to look back further or correct these issues. Instead, the conversation shifted to discussing how Martin's Point could generate more money in light of these issues.

128.    To Relator's knowledge, not even these specific codes were deleted: the overpayments were retained by Martin's Point, despite actual knowledge that the codes submitted were erroneous.

### 3.    Known Error Prone Conditions.

129.    Relator estimates the most significant overpayments to Defendant have resulted in providers coding heart attacks, cancers, and strokes as active conditions, when they are in fact historical conditions.

130.    Relator saw the issue frequently as she reviewed charts and knew it to be common knowledge among chart review coders. Relator herself discovered numerous instances where the patient's medical record clearly indicated a condition was historical and no longer present, but had been coded to CMS as an active condition erroneously by the provider. These included:

- Patient A had breast cancer in 2006, but a 2014 benign mammogram and no indication of cancer since; yet Martin's Point submitted the provider's diagnosis code indicating active breast cancer for the 2016 payment year and failed to delete the error when detected during retrospective chart reviews.
- Patient B reported a history of breast cancer to her doctor, and requested a mammogram. Her most recent 2014 mammogram had no evidence of malignancy; yet Martin's Point submitted the provider's diagnosis code indicating malignant breast cancer for the 2015 payment year and failed to delete the error when detected during retrospective chart reviews.
- Patient C had bladder cancer in 2013. The record from his 2016 exam explicitly stated the healthcare provider found no evidence supporting active cancer; yet Martin's Point submitted the provider's diagnosis code indicating active bladder cancer for the 2017 payment year and failed to delete the error when detected during retrospective chart reviews.
- Patient D's medical record indicated a history of stroke, with the last stroke occurring in 2008. Records from their 2016 physical exam noted "no acute distress," and no indication or record of a stroke. Yet, for the 2017 payment year, Martin's Point submitted the provider's diagnosis code indicating the patient had a stroke during this office visit. Martin's Point failed to delete the error when detected during retrospective chart reviews.
- Patient E had prostate cancer in 2014 that resulted in a radical prostatectomy – removal of the prostate. His record indicated no evidence of recurrent prostate

cancer, yet Martin's Point submitted the provider's diagnosis code indicating active prostate cancer for the 2016 payment year. Martin's Point failed to delete the error when detected during retrospective chart reviews.

- Patient F had a history of stroke and was experiencing late after effects of a stroke. Her records indicated that the patient was in "no acute distress" during her office visit, and there was no indication the patient had a stroke within the last year. However Martin's Point submitted the provider's diagnosis code indicating the patient had an active cerebrovascular accident (a stroke) in the 2016 payment year, and failed to delete the error when detected during retrospective chart reviews.

131.    Relator alerted Martin's Point management to the issue, mentioning these three conditions to Manuel Gaidola and Dave Stearns (Senior Director of Health Plan) as frequently being coded as active when they were historical. Mr. Gaidola and Mr. Stearns responded to Relator's concerns by pivoting the conversation to maximizing revenue.

   **D.    Defendant has violated the False Claims Act through its submission of false risk adjustment attestations and its fraudulent retention of overpayments from Medicare.**

         1.    False Risk Adjustment Attestations Submitted to Government

132.    When Defendant designed a retrospective Chart Review Program solely for revenue maximization, encouraging coders to add new diagnosis codes while deliberately ignoring erroneously submitted codes that could have been readily identified and corrected, Defendant could not certify, based on best knowledge, information and belief, the accuracy, completeness and truthfulness of the data submitted to CMS.

133.    Defendant was aware – through chart reviewers themselves, Relator's objections, and Defendant's own internal audits – that a significant number of erroneous codes were not being deleted.

134.    On information and belief, Defendant's attestations were signed at various points by either Dan Chojnowski (CFO) or David Howes (CEO). Both Mr. Chojnowski and Mr. Howes were members of Martin's Point Revenue Steering Committee, which included Manuel Gaidola. As such, both would have had knowledge of Martin Point's steep internal revenue incentives for the Medicare Advantage plan. They also knew or recklessly disregarded or were deliberately

ignorant of Martin's Point's code-adding system design, as well as the high error rates uncovered by audits and other sources.

135.    A false Risk Adjustment Attestation, by its very nature, is material as it relates directly to the data element – diagnoses – that is the sole determinant of risk adjustment payments based on health status.  Submission of invalid diagnoses and failing to delete them are not minor or insubstantial infractions of Defendant's obligations to Medicare, including key data integrity obligations, with which they pledge to comply.

136.    Had CMS become aware that such attestations were false, and inaccurate diagnosis codes were submitted, it would have ceased or reduced payments to Defendant.

137.    The falsity of Defendant's Attestation, however, is not apparent on the face of the document, as information regarding invalid diagnoses do not accompany the Attestations to CMS. Furthermore, as noted above, CMS relies on the diagnosis codes provided by Defendant itself – underlying patient records are not transmitted to CMS. CMS therefore must be informed that Defendant has information showing that its diagnoses are invalid and that it failed to delete those invalid diagnoses. By concealing its knowledge of diagnosis code errors from CMS, Defendant also concealed the falsity of its Attestations.

2.    Fraudulent Retention of Overpayments From Medicare

138.    The diagnostic data submitted by Defendant are not merely ancillary to its claims for risk adjustment payments.  Rather, the diagnoses are generally the sole determinant in the calculation of any risk adjustment payment based on a beneficiary's health status.

139.    Defendant was required by their contracts with CMS, federal regulations, and CMS instructions explaining the federal regulations (e.g., the Managed Care Manual and Participant Guide) to delete invalid diagnoses.

140.    Defendant knew it was required to delete invalid diagnoses that it had submitted for payment and, in fact, it did this by making deletes in the RAPS system in extremely limited circumstances.

141.    If Defendant had complied with its obligation to delete invalid diagnoses from RAPS, Medicare's Risk Adjustment Processing System would have processed the corrected data and recalculated the risk score for the beneficiaries for whom an invalid diagnosis had been deleted.  The degree of the change in the payment amount for that beneficiary would have depended on the HCC to which the invalid diagnosis was grouped.  The risk adjustment reconciliation payment system would have made these adjustments automatically if the "deletes" were made in RAPS.  The system would have done this as part of the final reconciliation payment process or future reconciliations conducted by CMS for the payment year at issue.

142.    When Defendant failed to comply with its express obligation to delete the invalid diagnoses from RAPS prior to the final submission deadline, Medicare paid for the invalid diagnoses as part of its final reconciliation payment to Defendant or, if it already paid for the invalid diagnosis, did not recover the overpayment as part of the final reconciliation payment process.  When Defendant never deletes the invalid diagnoses from RAPS, Medicare does not recover the overpayment when future payment reconciliations are done for the payment year at issue.  Accordingly, the diagnostic information submitted by Defendant is not merely ancillary to its claim for risk adjustment payments, it is the sole determinant in the calculation of the amount (if any) of the risk adjustment payments made by Medicare based on the health status of a beneficiary and, therefore, inexorably material to the amount (if any) paid.

143.    Relator estimates that by systemically ignoring provider-generated diagnosis codes for historical – but erroneously coded as active – strokes, heart attacks and cancers alone, Defendant wrongfully retained millions of dollars per year in Medicare overpayments.

## Count I
## False Claims Act
## 31 U.S.C. §§ 3729(a)(1)(A)

144.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 143 above as though fully set forth herein.

145.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

146.    By and through the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

147.    Defendant's certifications on data accuracy to CMS were false claims when their Chart Review Program was only "one-way look," particularly where Defendant was on notice of a high error rate. Had the Government known Defendant's certifications and/or RAPs claims were false, it would have reduced or ceased its payments.

148.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

149.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

150.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein occurring prior to November 2, 2015, and $21,563 for each violation occurring after.

<u>**Count II**</u>
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

151.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 143 above as though fully set forth herein.

152.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

153.    By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment paid by the Government and/or with federal funds that should not have been paid to Defendant at all and/or in inflated amounts actually claimed and paid.

154.    These acts include but are not limited to unsupported diagnosis codes submitted to CMS through the RAPs system.

155.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

156.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

157.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein occurring prior to November 2, 2015, and $21,563 for each violation occurring after.

**Count III**
**False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(G)**

158.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 143 above as though fully set forth herein.

159.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

160.    By and through the acts described above, within the meaning of the False Claims Act, Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

161.    Defendant's retention of overpayments include, but are not limited to, overpayments on erroneous codes submitted to CMS which Defendant knew or should have known were erroneous.

162.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

163.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

164.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein occurring prior to November 2, 2015, and $21,563 for each violation occurring after.

## VII.    PRAYER

WHEREFORE, *qui tam* Relator prays for judgment against the Defendant as follows:

1.     That Defendant cease and desist from violating 31 U.S.C. § 3729 <u>et</u> <u>seq</u>.;

2.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 occurring prior to November 2, 2015, and for each violation of 31 U.S.C. § 3729 occurring after November 2, 2015, for the applicable inflation-adjusted penalties under the False Claims Act set forth in 28 CFR 85.5.

3.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4.    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.    That Relator recovers such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, *qui tam* Relator Alicia Wilbur hereby demands a trial by jury.

Dated: June 29, 2018

Respectfully submitted,

Jeffrey W. Dickstein
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com

Amy L. Easton
Rebecca P. Chang
PHILLIPS & COHEN LLP
2000 Massachusetts Ave NW
Washington D.C. 20036
Tel:  (202) 833-4567
aeaston@phillipsandcohen.com
rchang@phillipsandcohen.com


/s/ James B. Haddow
James B. Haddow
Maine State Bar No. 3340
PETRUCCELLI, MARTIN & HADDOW, LLP
Two Monument Square, P.O Box 17555
Portland, Maine 04112
Tel:  (207) 775-0200
jhaddow@pmhlegal.com

Attorneys for *Qui Tam* Plaintiff Alicia Wilbur